# UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA

THERESA K. GUILLIAUME,           )
                                 )
                                 )
            Plaintiff,           )
                                 )
v.                               )      No.  05-CV-411-SAJ
                                 )
JO ANNE B. BARNHART,             )
Commissioner of Social Security  )
Administration,                  )
                                 )
            Defendant.           )

## OPINION AND ORDER[1]

Pursuant to 42 U.S.C. § 405(g), Plaintiff appeals the decision of the Commissioner denying Social Security benefits.[2]  Plaintiff asserts that the Commissioner erred because (1) the ALJ improperly evaluated the opinion of Plaintiff's treating physician, Andrew Gordon, M.D., and, (2) the ALJ erred in concluding that Plaintiff's allegations regarding her limitations were not fully credible.  For the reasons discussed below, the Court reverses and remands the Commissioner's decision for further proceedings consistent with this opinion.

---

[1]   This Order is entered in accordance with 28 U.S.C. § 636(c) and pursuant to the parties' Consent to Proceed Before United States Magistrate Judge.

[2]   Administrative Law Judge Richard J. Kallsnick (hereafter "ALJ") concluded that Plaintiff was not disabled by decision dated March 22, 2005.  [R. at 14 - 24].  Plaintiff appealed the decision by the ALJ to the Appeals Council.  The Appeals Council declined Plaintiff's request for review on June 24, 2005.  [R. at 6].

## I. FACTUAL AND PROCEDURAL HISTORY

Plaintiff was born October 23, 1956.  [R. at 48].  On a social security form dated April 25, 2003, Plaintiff represented that she was still trying to work approximately one to three hours each day.  [R. at 47].

On a disability report submitted to the Social Security Administration, Plaintiff indicated she was unable to work due to three fusions in her neck, degenerative disk disease, arthritis, and high blood pressure.  [R. at 101].  Plaintiff indicated that severe pain in her back and neck prevented her from sitting or standing without pain.  [R. at 101]. Plaintiff believed she became unable to work beginning January 20, 2003.  [R. at 102]. According to Plaintiff, after surgery in January 2003, Plaintiff was unable to work for 12 weeks.  Since that time, Plaintiff noted that she has returned to work, but is able to work for only three to four hours each day.  [R. at 102]. Plaintiff noted that she was working four days per week for four hours each day as a bookkeeper.  [R. at 102].

In a Disability Supplemental Interview Outline, dated May 8, 2003, Plaintiff indicated that she tries to take care of her son and household and that she worked three to four hours each day.  Plaintiff noted that she was unable to stand more than one hour.  [R. at 117].  Plaintiff wrote that she had limited movement in her neck, used a step stool, and that could not reach above her head without pain.  [R. at 117].  Plaintiff sleeps four to six hours each night.  [R. at 117].  Plaintiff wrote that she cooked dinner about three or four times each week.  Plaintiff indicated that she could load the washer and dryer but that she was unable to bend over to get clothes out of the dryer.  [R. at 119].  Plaintiff indicated that these tasks took her one to two hours each day to perform.  [R. at 119].  Plaintiff

participates in hobbies for three to four hours each week.  Plaintiff's hobbies include glass painting and candle making.  [R. at 120].

Plaintiff wrote, on her pain questionnaire, that her daily activities were limited and she could not do anything requiring physical exertion, or lifting over ten pounds without pain.  [R. at 123].  Plaintiff noted that she had pain in her neck and back and experienced pain all day.  [R. at 123].

Plaintiff was interviewed by a disability examiner on May 8, 2003.  [R. at 126].  The examiner noted Plaintiff was pleasant and cooperative but appeared to be very uncomfortable.  Plaintiff constantly changed positions and had to stand several times. Plaintiff appeared uncomfortable walking.  [R. at 126].  Plaintiff indicated, on July 15, 2003, that she was unable to perform full-time work due to her pain.  [R. at 132].

Plaintiff completed a work activity report on May 8, 2003.  Plaintiff noted that she work four to five days each week for three to five hours each day.  [R. at 133].

Plaintiff's employer, April Girdner, wrote an undated letter which was faxed on February 11, 2005.  She indicated that Plaintiff initially worked from 8:30 until 3:00 each day, but that Plaintiff began hurting badly, and was then given Fridays off work.  Plaintiff still had difficulty working, and was shifted to Monday, Wednesday and Friday from 8:45 until 1:45.  Plaintiff's employer noted that sometimes Plaintiff is unable to work the five hours and sometimes she can.  [R. at 150].  Ms. Girdner wrote that Plaintiff constantly stands at her desk and is unable to sit in any one position for very long.  [R. at 150].  "She only works 12 - 15 hours a week now and that is hard for her."  [R. at 150].

An electromyogram dated September 23, 2002, was normal.  The doctor interpreted the results as a "normal study."  "Motor and sensory conduction velocity studies are normal.

I do not see evidence of median neuropathy at the wrist. . . . I do not see evidence of a cervical radiculopathy. This study is normal." [R. at 155].

Plaintiff complained of left arm and hand numbness on October 4, 2002. [R. at 336]. Plaintiff complained of persistent left hand pain and numbness for the previous two months. [R. at 337]. The doctor noted that in his opinion Plaintiff's disc disease was the source of her problem. [R. at 338]. On October 15, 2002, Plaintiff had a cervical myelogram. [R. at 334]. It revealed anterolisthesis of C7 on T1 weighted and anterior extradural defect at that level that resulted in a partial block of the spinal canal. [R. at 334].

An MRI scan dated November 15, 2002, indicated a mild compression at the cervicomedullary junction, and mild cervical spondylosis at C7/T1 secondary to subluxation. [R. at 162, 326-27]. Post operative changes were present at C1/2. [R. at 329].

Plaintiff was admitted January 20, 2003, and discharged January 23, 2003, for cervical spondylolisthesis and spondylosis at C7-T1 with myelopathy. [R. at 167]. The doctor noted that from a neurological standpoint Plaintiff could go home, but that Plaintiff was concerned because she took care of a seven year old and a 70 year old. [R. at 168].

Stanley O. Skarili, M.D., saw Plaintiff on December 12, 2002. He wrote that Plaintiff was 46, and had a history of developing left upper extremity numbness in August of 2002. Plaintiff had significant pain radiating down the medial aspect of her left upper arm to the left fourth and fifth digits which was becoming unbearable. Plaintiff was on Vioxx and Skelaxin. Plaintiff also reported a flare-up in her neck pain. The doctor concluded Plaintiff had spondylolisthesis at C7-T1 with an abnormal bone in the posterior elements. He recommended a cervical laminectomy at the C7-T1 with probably posterior instrumentation and fusion and an anterior procedure at C7-T1. On December 31, 2002, Dr. Skarli noted

that Plaintiff's bone scan showed increased uptake in the C7 distribution.  Flexion and extension films did not show significant movement.  Plaintiff continued to have severe radicular pain which was relieved by changing her head position and rotating away from the pain site, which Plaintiff reported gave her increased neck pain.  Dr. Skarli concluded that surgery was necessary because of the abnormal bone at the C7 level and for decompression, instrumentation and fusion.  [R. at 221].

Dr Skarli wrote, on January 29, 2003, that Plaintiff was doing well and had no further radicular symptoms.  [R. at 218].  Dr. Skarli reported on April 10, 2003, that Plaintiff appeared to be solidly fused 12 weeks post-surgery.  [R. at 214].  On May 6, 2003, Plaintiff was having mid neck pain with head movement.  [R. at 212].  Plaintiff was to be evaluated in physical therapy.  [R. at 212].  On June 5, 2003, Plaintiff's surgeon wrote that she was 19 weeks out from her surgery and was continuing to have significant neck pain when looking down.  Plaintiff reported going home crying after working at her desk and being unable to sleep well.  [R. at 210].  Plaintiff had relief with a TENS unit.  Plaintiff reported cramping in her left hand.  [R. at 210].

Plaintiff was referred for evaluation of spondylolisthesis on May 13, 2003.  [R. at 302].  X-rays indicated no significant change in alignment with multilevel degenerative disc disease noted.  [R. at 304].  In June 2003, Plaintiff continued to complain of severe neck pain and was described as tearful.  [R. at 297-98].

A typewritten note by Dr. Skarli dated August 5, 2003, indicates Plaintiff reported some improvement in morning stiffness from the Medrol Dosepak but did not believe it sufficient to warrant long-term steroids.  He notes that there is not much else that he can offer Plaintiff.  [R. at 204].  He believes Plaintiff has significant cervical spondylosis with

ankylosis which is most likely the reason for her original C1-2 subluxation.  He believes Plaintiff will continue to have further spondylitis and accompanying pain.  "She states that she is applying for disability and that she is not able to do her accounting work.  This is consistent with her significant cervical spondylosis and ankylotic fusion in her neck."  [R. at 204].

A Physical Residual Functional Capacity Assessment was completed July 2, 2003, by a Social Security doctor.  [R. at 192].  The doctor indicated Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, sit or stand for six hours in an eight hour day, and sit for six hours in an eight hour day.  [R. at 193].

On October 13, 2003, Plaintiff was admitted with complaints of chest pain.  Plaintiff was discharged October 14, 2003.  [R. at 227].  Records indicate Plaintiff had coronary artery disease and an angioplasty of her left anterior descending lesion.  [R. at 227].  Plaintiff was admitted after reports EMSA determined she had a markedly abnormal EKG.  Plaintiff had a 95% occluded single vessel LAD which required one stent placement with good result.  Plaintiff immediately felt better after the procedure.  [R. at 227].  Plaintiff was reportedly doing well on October 14, 2003, and was discharged home.  [R. at 227].

On October 15, 2003, notes indicate that Plaintiff needed assistance to stop smoking.  Plaintiff complained of severe chest pain for the prior month with a previously normal EKG, but a current abnormal one.  [R. at 289].

Plaintiff was evaluated on October 23, 2003, by Anil K. Reddy, M.D.  [R. at 244].  Plaintiff gave a history of having degenerative joint and disc disease of the cervical spine.  Plaintiff had three prior neck surgeries, with the first in 1990 or 1991.  Plaintiff has a fusion of her C3-C4 vertebrae with a bone graft; a second surgery in 1990 or 1991 and a repair

of the C3-C4 fusion with the third surgery in January 2003 with a C7 and T1 fusion and bone graft.  [R. at 244].  Plaintiff complained of constant dull neck pain with an intensity of 7 on a scale from one to ten.  Plaintiff stated the pain increased with activity.  [R. at 244].  Plaintiff indicated she could not walk more than one-half of one block due to neck pain which radiated into the low back.  Plaintiff stated she was unable to garden, vacuum, or lift more than ten pounds of weight.  [R. at 244].  Plaintiff did cook, some laundry, and drove independently.  [R. at 245].  Plaintiff gave a history of coronary artery disease.  Plaintiff took aspirin, Flexeril, Hydrocodone, and Darvocet as needed for pain.  [R. at 245].  Plaintiff smoked one-half of a pack each day for the past 25 years and drank no more than six cups of coffee each day.  [R. at 245].  According to Plaintiff, she can walk only one-half of one block because of chronic neck pain.  [R. at 245].  Plaintiff stated she was working a part-time job about four to five hours each day approximately three days each week.  [R. at 245].  Plaintiff's muscle strength was 5/5 in all four extremities.  [R. at 246].  Plaintiff walked for 120 feet on bilateral heels and tiptoes and was able to tandem walk.  Plaintiff had a stable but slow gait.  Plaintiff got onto and off of the examination table without difficulty.  [R. at 246].  Plaintiff's back and neck extensions were impaired.  Plaintiff had full range-of-motion for her hip, knee, ankle, shoulder, elbow, wrist, and thumbs.  [R. at 252-53].

Notes dated October 24, 2003, indicate Plaintiff called regarding exercise.  Plaintiff inquired about walking on the treadmill.  The recommendation was that Plaintiff wait for three weeks and then start back on the treadmill at a low rate of speed for 15 minutes and gradually increase her time.  [R. at 287].

Plaintiff was admitted on November 9, 2003 and discharged November 10, 2003.  Plaintiff complained of chest pain, but her stent looked fine.  The discharge indicated

Plaintiff had non-cardiac chest pain, to follow-up with her doctor.  [R. at 257].  Consult notes dated November 10, 2003, indicate Plaintiff was recommended for angiography and possible angioplasty.  [R. at 259].

On December 31, 2003, Plaintiff complained of constant chest pain.  The doctor's notes indicated that it looked like a "gi problem."  [R. at 279].

On January 1, 2004, Plaintiff had a normal exercise myocardial perfusion scan. Plaintiff's scan was interpreted as revealing normal left ventricular wall motion and systolic function.  [R. at 354].

A Residual Physical Functional Capacity Assessment was completed March 31, 2004, by Paul Woodcock, M.D.  [R. at 357].  Plaintiff was noted as being able to occasionally lift 20 pounds, frequently lift or carry 10 pounds, stand or walk six hours in an eight hour day, and sit six hours in an eight hour day.  [R. at 358].

Plaintiff's records show continued complaints of chest pain thru September and October 2004.  [R. at 369, 371].

Plaintiff's doctor, Andrew R. Gordon, M.D., on February 14, 2005, wrote a letter on Plaintiff's behalf.  He noted that Plaintiff had been a patient for several years and complained of chronic pain in her neck which limited her ability to work and lift.  Plaintiff's three neck surgeries in 1990 and 1991 resulted in fusion of her C-3 and -4 discs.  Plaintiff also had a C-7 T-1 fusion for spondylolesthesis in 2003.  Plaintiff's pain was reportedly more limiting to her.  "On exam she has pain with movement of the neck and limitations to movement of the neck. . . .  At this point no further surgery can be done and she relies on medications for relief of pain."  [R. at 374].  The doctor completed a medical source statement.  On the statement he wrote, "I have no actual way to evaluate this, these are

numbers she reports to me." [R. at 375]. This comment appears next to the amounts that Plaintiff can lift and carry. With regard to an eight hour work day, the doctor indicated Plaintiff could sit, stand, or walk for one hour at a time or one hour total during an eight hour day. The doctor wrote "neck and low back pain chronic" in the margin next to the times that he circled. [R. at 375].

Plaintiff testified at a hearing before the ALJ on February 15, 2005. [R. at 381]. Plaintiff was born October 23, 1956, and was 48 at the time of the hearing before the ALJ. [R. at 386]. Plaintiff has one child who is nine years old. [R. at 386]. Plaintiff stated that she was five foot two inches tall and weighed 180 pounds. [R. at 386]. Plaintiff completed high school. [R. at 386].

Plaintiff testified that she has worked at her current job, as a bookkeeper, since August of 2002. [R. at 386]. After Plaintiff's neck surgery in 2003, she began working part time and was given special circumstances by her employer. [R. at 387]. Plaintiff noted that when she began working as a bookkeeper she worked 30 to 36 hours each week. [R. at 391]. Plaintiff stated that, at the time of the hearing, she was working between 12 and 16 hours each week. [R. at 391]. Plaintiff noted that she was unable to perform her job as she previously performed it. Plaintiff cannot sit for any length of time and must frequently change positions. [R. at 391]. Plaintiff believes that the longest that she can remain seated is approximately 20 minutes. [R. at 392]. Plaintiff believes that the primary reason that she has not been fired is because she is employed by a friend. [R. at 392].

Plaintiff had her third neck surgery in January 2003. [R. at 393]. Plaintiff testified that she has continual neck spasms and that medication does not relieve her spasms. [R. at 393]. Plaintiff takes medication each day, and with medication, Plaintiff states that her

pain is approximately a five or six on a scale from one to ten.  [R. at 394].  Plaintiff has lost

almost all mobility in her neck.  [R. at 394].  Plaintiff also believes that she is developing

arthritis in her hands because her hands cramp.  [R. at 395].  Plaintiff was placed on Zoloft

for her depression, but asked that she be taken off of the medication.  [R. at 396].

Plaintiff can stand for about 15 to 20 minutes at a time.  [R. at 396].  When Plaintiff

shops she has to lean on a cart.  [R. at 397].  Plaintiff can sit for about 15 to 20 minutes.

[R. at 397].  Plaintiff has a heat and massage chair that she sits in while she is at home.

[R. at 397].  Plaintiff believes she can lift about ten pounds.  [R. at 397].  Plaintiff can feel

pulling in her neck when she lifts.  [R. at 397].

Plaintiff can do laundry, but has difficulty bending to get clothes out of the dryer.  [R.

at 398].  Plaintiff sits on a bar stool when she is cooking.  Plaintiff does drive to work, but

primarily relies upon her husband to drive her.  [R. at 399].

Plaintiff's husband testified at the hearing and stated that Plaintiff's condition was

becoming worse.  [R. at 408].  Plaintiff's husband does a lot of the chores at home,

including vacuuming, picking up, groceries, and cooking.  [R. at 409].

## II. SOCIAL SECURITY LAW AND STANDARD OF REVIEW

The Commissioner has established a five-step process for the evaluation of social

security claims.  *See* 20 C.F.R. § 404.1520.  Disability under the Social Security Act is

defined as the

> inability to engage in any substantial gainful activity by reason
> of any medically determinable physical or mental impairment
> . . . .

42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Social Security Act only if his

physical or mental impairment or impairments are of such
severity that he is not only unable to do his previous work but
cannot, considering his age, education, and work experience,
engage in any other kind of substantial gainful work in the
national economy. . . .

42 U.S.C. § 423(d)(2)(A).[3/]

The Commissioner's disability determinations are reviewed to determine (1) if the
correct legal principles have been followed, and (2) if the decision is supported by
substantial evidence. *See* 42 U.S.C. § 405(g); *Bernal v. Bowen*, 851 F.2d 297, 299 (10th
Cir. 1988); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).

The Court, in determining whether the decision of the Commissioner is supported
by substantial evidence, does not examine the issues *de novo*. *Sisco v. United States
Dept. of Health and Human Services*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not
reweigh the evidence or substitute its judgment for that of the Commissioner. *Qualls v.
Apfel*, 206 F.3d 1368 (10th Cir. 2000); *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir.
1994). The Court will, however, meticulously examine the entire record to determine if the
Commissioner's determination is rational. *Williams*, 844 F.2d at 750; *Holloway v. Heckler*,
607 F. Supp. 71, 72 (D. Kan. 1985).

---

[3/]    Step One requires the claimant to establish that he is not engaged in substantial gainful activity (as defined
at 20 C.F.R. §§ 404.1510 and 404.1572). Step Two requires that the claimant demonstrate that he has a
medically severe impairment or combination of impairments that significantly limit his ability to do basic work
activities. *See* 20 C.F.R. § 1521. If claimant is engaged in substantial gainful activity (Step One) or if claimant's
impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, claimant's
impairment is compared with those impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"). If
a claimant's impairment is equal or medically equivalent to an impairment in the Listings, claimant is presumed
disabled. If a Listing is not met, the evaluation proceeds to Step Four, where the claimant must establish that his
impairment or the combination of impairments prevents him from performing his past relevant work. A claimant
is not disabled if the claimant can perform his past work. If a claimant is unable to perform his previous work, the
Commissioner has the burden of proof (Step Five) to establish that the claimant, in light of his age, education, and
work history, has the residual functional capacity ("RFC") to perform an alternative work activity in the national
economy. If a claimant has the RFC to perform an alternate work activity, disability benefits are denied. *See
Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

"The finding of the Secretary[4/] as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §  405(g).  Substantial evidence is that amount and type of evidence that a reasonable mind will accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Williams*, 844 F.2d at 750.  In terms of traditional burdens of proof, substantial evidence is more than a scintilla, but less than a preponderance.  *Perales*, 402 U.S. at 401.  Evidence is not substantial if it is overwhelmed by other evidence in the record.  *Williams*, 844 F.2d at 750.

This Court must also determine whether the Commissioner applied the correct legal standards.   *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).   The Commissioner's decision will be reversed when he uses the wrong legal standard or fails to clearly demonstrate reliance on the correct legal standards.  *Glass*, 43 F.3d at 1395.

### III.  ADMINISTRATIVE LAW JUDGE'S DECISION

The ALJ found that Plaintiff could perform light work activity.  Based on the testimony of a vocational expert, the ALJ concluded that Plaintiff was not disabled.

### IV.  REVIEW

**TREATING PHYSICIAN OPINION**

The "treating physician rule" requires that the Commissioner give more weight to a treating source than to that of a non-treating source.  *Langley v. Barnhart*, 373 F.3d 1116 (10th Cir. 2004); 20 C.F.R. § 404.1527(d)(2).  "In deciding how much weight to give a treating source opinion, an ALJ must first determine whether the opinion qualifies for

---

[4/]    Effective March 31, 1995, the functions of the Secretary of Health and Human Services ("Secretary") in social security cases were transferred to the Commissioner of Social Security. P.L. No. 103-296. For the purpose of this Order, references in case law to "the Secretary" are interchangeable with "the Commissioner."

'controlling weight.'"  *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).  The ALJ, in making this determination, first should consider "whether the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques.  If the answer to this question is 'no,' then the inquiry at this stage is complete.  If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record.  [I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight."  *Langley*, 2004 WL 1465774; *Hamlin v. Barnhart*, 365 F.3d 1208 (10th Cir. 2004) ("The ALJ is required to give controlling weight to the opinion of a treating physician as long as the opinion is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record."); *Watkins v. Barnhart*, 350 F.3d 1297 (10th Cir. 2003) ("The analysis is sequential.  An ALJ must first consider whether the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques.").

In *Robinson v. Barnhart*, 366 F.3d 1078 (10th Cir. 2004), the Tenth Circuit Court of Appeals discussed the analysis the ALJ should make in evaluating a treating physician's opinion.

> An ALJ must first consider whether the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques."  SSR 96-2p, 1996 WL 374188, at *2.  If the answer to this question is "no," then the inquiry at this stage is complete.  If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record.  In other words, if the opinion is deficient in either of these respects, then it is not entitled to controlling weight.

If the ALJ concludes that the treating physician's opinion is not entitled to controlling weight, the inquiry does not end.  The ALJ must then evaluate whether the treating source

-- 13 --

medical opinions are entitled to deference and the ALJ must weigh the treating opinion using all of the factors provided in § 404.1527.  *See Langley*, 2004 WL 1465774; *Hamlin*, 365 F.3d at 1215 (ALJ must consider specific factors in determining what weight to give medical opinion).  The factors which the ALJ should evaluate include:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* at 290; 20 C.F.R. § 404.1527(d)(2)-(6).  *See also Watkins*, 350 F.3d at 1300 (resolving "controlling weight" issue is not end of review; ALJ must evaluate treating physician opinion factors).

In addition, "[w]hen a treating physician's opinion is inconsistent with other medical evidence, the ALJ's task is to examine the other physicians' reports to see if they outweigh the treating physician's report, not the other way around."  *Hamlin*, 365 F.3d at 2115 (*citations omitted).*

Plaintiff asserts that the ALJ did not properly address the opinion of Plaintiff's treading physician Dr. Gordon.  Plaintiff is correct.

In this case, the ALJ's opinion contains no discussion of the weight given by the ALJ to the opinion of the treating physician, and no specific discussion of the factors outlined by the courts.  The ALJ primarily dismisses the reports from Dr. Gordon as more related to Plaintiff's credibility.

Initially, the ALJ appears too quick to completely disregard Dr. Gordon's report based on one notation in the margin of one report which appears related to lifting and carrying requirements.   In completing the Physical Medical Source Statement, in the section which requires a doctor to indicate the amounts of weight that a claimant can lift and carry, the Plaintiff's doctor drew an arrow to that section and wrote "I have no actual way to evaluate this; these are numbers she reports to me."  [R. at 375].   The doctor's signature appears next to the handwritten note.   The ALJ dismissed Dr. Gordon's conclusions, in part, because "Dr. Gordon expressly noted that his report was based upon the claimant's own statements regarding what she remains able to do despite her impairments."  [R. at 18].   However, the only place in the records and forms in which Dr. Gordon indicated his conclusions were based on Plaintiff's representations were with respect to Plaintiff's lifting and carrying abilities.   The ALJ's application of the doctor's statement to all of the doctor's conclusions oversteps the qualification placed by the doctor on his report.

The only other basis given by the ALJ to discount the opinion of Dr. Gordon references the sitting, standing, and walking limitations listed by Dr. Gordon.  Dr. Gordon noted that Plaintiff could sit for a total of one hour per day, stand for one hour per day, and walk for one hour per day.  Plaintiff's total limitations for an eight hour day were listed as one hour sitting, one hour standing, and one hour walking.  First, the ALJ contends that such limitations were inconsistent with Plaintiff's part-time job activities.  However, Plaintiff testified that she was, at the time of the hearing, able to work only 12 to 16 hours per week.  In addition, Plaintiff's employer submitted a letter dated February 11, 2005, indicating that Plaintiff worked 12 to 15 hours per week.  These representations are consistent with

working up to three hours per day.  The ALJ's second reason for discounting the doctor's report of Plaintiff's limitation is that "one's ability to perform such activity should reasonably be longer for a full workday than at one time."  The Court will not address whether or not this is a logical presumption.  Regardless, if the ALJ had questions as to the doctor's report of Plaintiff's abilities to perform at one time (which is not defined on the form) as compared to the entire eight hour day, the ALJ should have recontacted the doctor for clarification. 20 C.F.R. § 404.1512(e)(1)("We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. . . .).

On remand, the ALJ should evaluate the opinion of the treating physician and determine whether or not controlling weight is appropriate with regard to the physician's opinion.  The ALJ should recontact the treating physician with regard to conflicts or ambiguities that the ALJ believes exist in the treating physician's opinion.  The ALJ should provide the reasons given for accepting or rejecting the opinion of the treating physician, or in determining the deference to give to the opinion of the treating physician.

Dated this 14th day of September 2006.

Sam A. Joyner
United States Magistrate Judge